IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x          14-CR-00460(LGS)

U.S.A                                                              :
                                                                   :
Plaintiff                                                          :
                                                                   :
v.                                                                 :
                                                                   :
Paribas                                                            :
                                                                   :
Defendants, et al.                                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM IN OPPOSITION TO THE GOVERNMENT'S MOTION TO DISMISS WIEDERSPAN'S NOTICES OF LIEN AND IN RESPONSE TO THE GOVERNMENT'S OPPOSITION TO WIEDERSPAN'S MOTION FOR CONFERENCE AND HEARING

Third party Marilyn Wiederspan ("Wiederspan") respectfully submits this Memorandum in Opposition to the Government's Motion to Dismiss and in response to the Government's Opposition to Wiederspan's Motion for Conference and Hearing. (Doc. No. 36). The Government concedes that $8,833,600,000 – the amount of the money judgment against BNP Paribas S.A. ("BNPP") – were "proceeds it knowingly and willfully moved through the U.S. financial system in violation of U.S. sanctions." USG Memo at 2. Further, the Government concedes that $1.747 billion of those funds were for "illicit transactions with Cuban entities." Under the Trading with the Enemy Act, and the Cuban Assets Control Regulations, those funds were blocked by operation of law as soon as they were transferred to BNPP for transactions in which Cuban entities had an interest. Blocked assets are attachable when "a person has obtained a judgment against a terrorist party on a claim based on an act of terrorism." Terrorism Risk Insurance Act of 2002 ("TRIA") (Pub.L. 107–297) § 201(a). Cuba was designated by the U.S.

Secretary of State on March 1, 1982 and it has retained that designation to the present day.[1]   The judgment Wiederspan seeks to enforce through her lien is based exclusively on Cuba's acts of terrorism,[2] and thus fall squarely within the scope of TRIA.[3]  For these reasons, Wiederspan has standing to enforce her $63.6 million judgment lien against the funds which are the subject of this forfeiture proceeding.

Wiederspan's standing in this matter also derives from her position as an interested Third Party judgment creditor, that has effectively filed liens to attach to the subject funds.  Such lien rights are afforded under 12 U.S. Code Section 853, and under New York law, which allows judgment creditors an opportunity to attach liens against the real and personal property of the debtor.

Finally, there is no merit to the Government's contention that the court should decide these important issues without a hearing or conference.  While a hearing is not *required*, it is not precluded, and the Government offers no reason why in this case the court should deny a hearing or conference in the sound exercise of its discretion.

---

[1]  *See* State Sponsors of Terrorism, U.S. Department of State, *available at* http://www.state.gov/j/ct/list/c14151.htm (last viewed April 8, 2015).

[2] *See* Notice of Lien (Doc. 29), Exhibit B, Amended Final Judgment, para. 17 ("Defendants' actions are properly clarified as torture, assassination and extra-judicial killing.").

[3] The text of TRIA unambiguously requires that there (1) be a judgment, (2) against a terrorist party, and (3) the claim underlying the judgment be based on an act of terrorism.  *See United States v. Santos*, 541 F.3d 63, 67 (2d Cir.2008) ("When a court determines that the language of a statute is unambiguous, its inquiry is complete.").

## (A) ARGUMENT

## (1) The Government Concedes that $8,833,600,000 – the Money Judgment amount – were "Proceeds it Knowingly and Willfully" Moved thru US Financial System in Violation of US Sanctions .

The Government has also conceded that part of the original money judgment, included $1,747 billion in funds that were for "illicit transactions with Cuban entities". Under the Trading with the Enemy Act ("TWIA"), which has been in existence since 1917, such assets are to be blocked under operation of law. BNPP failed to do so when it allowed the funds to be transferred through the US financial system. Also under the Cuban Assets Control regulations, those funds should have been blocked by operation of law as soon as they were transferred to BNPP for transactions in which Cuban entities had an interest. Cuban Assets Control Regulations, 31 C.F.R. §515.201(a)(1) and (c).

Indeed, it was the violation of these provisions of the Cuban Assets Control Regulations, among others, that underlies the $1 billion settlement between OFAC and BNPP, which is part of the $8.8 billion penalty imposed on BNPP. *See* Settlement Agreement between OFAC and BNPP (Doc. 20-4), para. 21 ("From on or about July 18, 2005, to on or about September 10, 2012, BNPP processed 909 electronic funds transfers in the aggregate amount of $689,237,183 to or through fmancial institutions located in the United States in apparent violation of the prohibition on dealing in property in which Cuba or a Cuban national has an interest, 31 C.F.R. § 515.201."

There is a continuing strong federal policy in support of the right of judgment creditors like Wiederspan to attach and execute against blocked assets of Cuba and other designated State Sponsors of Terrorism, as manifested by the fact that the Act was extended by the House of

Representatives on January 7, 2015 by a vote of 416-5, and by the Senate the next day by a vote of 93-4. On January 12, 2015, President Obama signed the extension into law as Pub. L. 114-1.

**(2) <u>TRIA Authorizes Judgment Creditors to Have Standing and Attach Blocked Assets</u>**

Cuba was designated as a terrorist nation by the US Secretary of State on March 1, 1982, and it has retained that designation to the present day.

The judgment Wiederspan seeks to enforce thru her liens is based exclusively on Cuba's acts of terrorism, and thus falls squarely within the scope of TRIA. For these reasons, Wiederspan has standing to enforce her $63.6 million judgment lien against the funds which are the subject of this forfeiture proceeding.

**(a)      <u>Wiederspan has standing under TRIA</u>**

In its memo, the Government raises grounds that question Wiederspan's standing in this matter. The Government, however, fails to cite to or recognize TRIA's statutory effects in this case.

The court in <u>Calderon-Cardona v. Bank of NY Mellon</u> No,12-0075 (Second Circuit, October 23, 2014), clarified as follows:

"TRIA authorizes plaintiffs holding a judgment against a terrorist party to attach blocked assets of the terrorist party or any agency or instrumentality of the terrorist party. See TRIA §201(a)."

The statute provides:

"Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based on an act of terrorism, or for which a terrorist party is not immune under [28 U.S.C. § 1605(a)(7) ], the blocked assets of that

4

terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in the aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable"

TRIA §201(a) (emphasis supplied).

On August 10, 2012, Congress "…amended TRIA and added language indicating that it is applicable to section 1605A judgment holders". See Iran Threat Reduction and Syrian Human Rights Act of 2012, Pub.L. No. 112–158, § 502(e) (Aug. 10, 2012).

Subsequent to the "enactment of TRIA, in 2008, Congress also enacted 28 U.S.C. § 1610(g), which authorizes attachment remedies for plaintiffs seeking to satisfy a judgment obtained under § 1605A. See 28 U.S.C. § 1610(g)(1) (allowing attachment of property of a foreign state "against which a judgment is entered under section 1605A"). Section 1610(g) not only allows attachment of property of a foreign state but also property of an agency or instrumentality "that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity." Id. § 1610(g)(1). **Attachment is allowed even if the property is regulated under TWEA or IEEPA.** Section 1610(g), however, does not "supersede the authority of a court to prevent appropriately the impairment of an interest held by a person who is not liable in the action giving rise to a judgment in property." Id. § 1610(g)(3). (emphasis added).

In the instant case, BNPP admittedly failed to report that the assets had transferred through BNPP accounts in the US financial system. This unlawful action on BNPP's part is one of the primary reasons for this criminal action, and prevented judgment creditors, such as Wiederspan, from attaching the funds.

The Government claims that the "subject funds" are separate from the original $8.9 billion that were illicitly transferred. Wiederspan understands this position. The Government, however, has not been able to prove this point.

Furthermore, even if the Government were to prove it, the Government's position would essentially be thwarting the TRIA statute's intention.

"The statute was clearly written in an effort to aid victims of terrorism to satisfy their judgments." Calderon-Cardona quoting 28 USC §1610(f). Pub. L. 107-297, 116 Stat. 2322 (2002), reprinted in relevant part at 28 USC §1610 note; H.R. Rep. No 107-779, at 27 (2002)(Conf. Rep.).

If the "subject funds" were considered to be separate from the illicit funds, then BNPP's unlawful activities would have prevented precisely what Congress intended – to aid victims of terrorism to satisfy their judgments.

**(3) The Illicit Cuban Funds ($1.747 Billion) were owned by Cuba Prior to Entering the US Financial System.**

Court records filed by the US Government reflect the extent to which BNPP acted in order to avoid declaring Cuba's ownership of the $1.7 billion US dollars.

In Calderon-Cardona the court indicated: We therefore hold that an EFT blocked midstream is "property of a foreign state" or "the property of an agency or instrumentality of such a state," subject to attachment under 28 U.S.C. § 1610(g), only where either the state itself or an agency or instrumentality thereof (such as a state-owned financial institution) transmitted the EFT directly to the bank where the EFT is held pursuant to the block.

The Government's documents, in numerous instances, concede to the fact that $1.747 billion of those funds were for "illicit transactions with Cuban entities."

Unless proven otherwise, it would thus be reasonable to conclude, that the funds, which should have been blocked in accordance with US Statutes and OFAC regulations, were property of the foreign state.

As the Government is primarily focusing on Wiederspan's lack of standing in this matter, Wiederspan believes further description of the applicable statutes and caselaw would be instructive.

The 2nd Circuit clarified in <u>JP Morgan v. Hausler</u>, "TRIA permits attachment only of assets in which the terrorist party or its agency or instrumentality have an ownership interest". <u>Hausler et al., v JP Morgan Chase Bank, et al.</u>  No. 12-1264 (L) at 5-8; (2nd Circuit, October 27, 2014).

Given the Government's admissions that $1,747 billion of the illicit funds were for the "illicit transactions with Cuban entities," it is assumed that Cuba had an ownership interest in those funds, which should have been blocked.

The Hausler court, in pages 5-8,  goes on to clarify: Case law in a variety of contexts supports the intuitive conclusion that assets "of " Cuba are a narrower category than assets in which Cuba has "any interest of any nature whatsoever." The Supreme Court has repeatedly observed that the " 'use of the word 'of ' denotes ownership.' " Stanford, 131 S. Ct. at 2196 (quoting Poe v. Seaborn, 282 U.S. 101, 109 (1930)); see also id. (describing Flores-Figueroa v. United States, 556 U.S. 646, 648, 657 (2009), as treating the phrase "identification [papers] of another person" as meaning such items belonging to another person (internal quotation marks omitted)); <u>Ellis v. United States</u>, 206 U.S. 246, 259 (1907) (interpreting the phrase "works of Case: 12-1264 Document: 133 Page: 25 07/09/2012 658208 3418 the United States" to mean "works belonging to the United States" (internal quotation marks omitted)). Applying that

understanding in interpreting a disputed provision of patent law, the Court in Stanford concluded that "invention of the contractor" is naturally read to mean "invention owned by the contractor" or "invention belonging to the contractor." 131 S. Ct. at 2196.

The Hausler court was careful to point out that the terrorist party, Cuba, had to have an ownership interest. The government in this matter has already admitted to Cuba's ownership interests, in the $1.747 Billion in funds that under statute and regulations, should have been blocked.

**(4) Wiederspan also has Standing under Federal Forfeiture law and Pertinent New York State law.**

In its Motion to Dismiss the Government has misinterpreted the relevant federal forfeiture caselaw and pertinent New York state law. It is without question, that in the filing documents, the Government makes numerous references to BNPP'S extensive business transactions with the Republic of Cuba and its related entities. It is only in its Motion to Dismiss, that the Government is now claiming that the "Subject Funds" are separate from the funds, approximately $8.9 billion U.S. dollars, which were the basis for the criminal action against BNPP. The Government cannot overlook the relevant documents, such as the Information and Statement of Facts, which is attached to the Plea Agreement, that they have filed in this matter. (Dkt No. 2, and Dkt No. 13, Exhibit 2).

Throughout the filed documents, which have already been accepted by BNPP and the Government as true, there are countless references to BNPP's close business relationship with Cuba. Such close business ties involved, among other matters, the assistance to Cuba in obtaining millions of dollars in funds for various purposes. BNPP not only accepted these facts as true, but waived their right to be tried by Indictment.

The 2nd Circuit standard for a Motion to Dismiss is clear, and is discussed at length in this memo. All facts averred by the plaintiffs/petitioner must be taken as true for purposes of the standing inquiry as they must be for any other issue presented. If the facts, as set forth in the Statement of Facts and Information, are weighed in favor of Wiederspan, then there is clear room for disagreement as to whether the Subject Funds belonged to Cuba, or whether Cuba had an interest in them. For purposes of the Information and Statement of Facts, BNPP has admitted to trading with the enemy, Cuba, in the amount of $1.7 billion U.S. dollars. Such factual questions are to be construed in favor of Wiederspan. For these and other reasons, the Motion to Dismiss should thus be denied.

**(5)** **Wiederspan's Standing also derives from her position has an Interested Third Party Judgment Creditor that has filed Notices of Lien**

Other than a few points of disagreement, Wiederspan agrees with most of the Government's assertions in the Facts and Procedural Background portion of the motion. Wiederspan specifically disagrees with the Government's claim that "There is no evidence in the record that ties the Subject Funds to the conspiracy or to the Government of Cuba and the Government has no reason to believe that such evidence exists." (See Docket Entry 36 at 2-3). The evidence in the record consists of numerous references to Cuba and BNPP's lengthy business transactions. It is only now that the Government is claiming that the Subject Funds are separate from the funds that were the subject of the investigation. This fact is not made clear in any of the filed documents.

Through counsel, Wiederspan did file a Notice of Lien on January 29, 2015, and an Amended Notice of Lien on February 27, 2015.

In footnote 3 of its Motion to Dismiss, the Government claims that Wiederspan alleged that the liens were filed pursuant to 28 USC §3201, and that §3201 relates to judgment liens

against real property. Wiederspan does recognize that §3201 involves judgment liens against real property, and admits that this was an oversight. Throughout the Amended Notice of Lien, however, Wiederspan clarifies her right to file such lien under 12 U.S. Code Section 853, and under New York law, which allows judgment creditors an opportunity to attach liens against the real and personal property of the debtor.

Furthermore, Wiederspan has filed a complaint in the Southern District of New York (S.D.N.Y.) to domesticate the Florida court judgment, and the S.D.N.Y. Case No. is 1:15-CV-01983-VEC.

Wiederspan is not a plaintiff in these proceedings, yet is an "interested" party. As an interested party responding to the Government's Motion to Dismiss, Wiederspan believes that the regularly applicable standards for motions to dismiss should apply. The allegations suffice to show that Wiederspan has suffered an injury in fact for standing purposes.

The Wiederspan judgment includes only compensatory damages and not punitive damages. In her attempt to collect on the judgment, Wiederspan has conducted extensive research and expended significant funds. The Government concedes that during the year 2012, BNPP was still conducting unlawful and criminal business activities with Cuba, Iran and Sudan. (Information at 1). In essence, BNPP was doing business with Cuba, an enemy of the United States, and assisting Cuba in hiding its assets. BNPP has readily admitted to hiding such unlawful activity from the US Government. In addition to having statutory standing under TRIA, Wiederspan has clearly suffered an injury in fact as a result of BNPP's unlawful business activities. BNPP's unlawful actions have curtailed Wiederspan's attempts to collect on her judgment. The Government has conceded that monies actually belonged, or were owned by Cuba. The Government claims: "The purpose of the credit facilities was to provide financing to

Cuban entities" and another example mentions how BNPP helped Cuba obtain "US dollar loans for one of Cuba's largest state-owned companies." (Statement of Facts, paragraphs 49-70).

If BNPP approved loans for Cuba to buy oil, or for any other similar purpose, then after approval of the loans, the money obviously belonged to Cuba. The Government has not substantiated its assertion that the Subjects Funds are separate. Nor is there evidence on the record to support its claim.

USA alleges, "at most Wiederspan has alleged that she has a judgment against Cuba, but that is plainly insufficient to establish standing to assert a claim on the Subject Funds, which were transferred to the Government not from Cuba but from BNPP, and which, moreover, are in no way connected to any funds from or belonging to Cuba." (Motion to Dismiss at p. 7).

Wiederspan understands the Government's allegations as to the Subject Funds, but respectfully disagrees. The Government claims that the funds "are in no way connected to any funds from or belonging to Cuba." Yet, throughout the Statement of Facts and the Information, the Government makes countless references to BNPP's business with Cuba, and how the funds alleged in the filed documents, do, clearly have a strong connection to funds from and belonging to Cuba.

In accordance with the standard for motions to dismiss, "all facts averred by the plaintiffs must be taken as true for purposes of the standing inquiry – as they must be for any other issue presented." *Lerman v. Bd. of Elections*, 232 F.3d 135, 142 (2d Cir. 2000); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)

The Government cannot have it both ways. On the one hand, it alleges that BNPP must forfeit $1.7 billion for alleged business activity with Cuba, yet, on the other hand, claim that those funds are not connected to any funds from Cuba.

In addressing the Motion to Dismiss, a court must assume that all of the facts alleged by third party petitioner Wiederspan, are true, construe those facts in the light most favorable to, and draw all reasonable inferences, in favor of petitioner. *See Abdullahi v. Pfizer, Inc*., 562 F.3d 163, 169 (2d Cir. 2009); *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co*., 517 F.3d 104, 115 (2d Cir. 2008); *U.S. Bank Nat. Ass'n v. Ables & Hall Builders*, 582 F. Supp. 2d 605, 606 (S.D.N.Y. 2008) (Chin, J.).

**Given this standard, there is no doubt that the Government's motion to dismiss should be denied. This is so if in fact Wiederspan's allegations are all assumed to be true, and it is also so, if the Government's allegations in the filed documents are assumed to be true.**

### (a) Wiederspan's Request for an Ancillary Hearing Should Be Approved

The Government is of the opinion that as to ancillary proceeding in criminal forfeiture matters, "There is no ambiguity here an ancillary proceedings is not appropriate where the forfeiture consists solely of a money judgment". United States v. Tolliver, 370 F. 3d 1216, 1233 (10th Cir. 2013). (See Docket Entry 36, page 4). A careful review of Tolliver, however, will show that the Government has misconstrued the language. The Tolliver court never mentions what is or is not "appropriate" when the forfeiture consists of a money judgment. The Tolliver court simply recognizes what Rule 32.2(c)(1) requires and does not require. Rule 32.2(c)(1) does not require a hearing in forfeitures involving money judgments. The Rule, however, and subsequent case law, leaves it up to the discretion of the court. There is no case law, however, which indicates the appropriateness of such a hearing.

The Government claims in p.2 of the motion that because "BNPP forfeiture consists solely of an *in personam* money judgment. There is no avenue for third party intervention." This claim however, is not supported by case law.

First of all, Wiederspan has not filed a Motion to Intervene. Rather, she has filed motions to support her assertion as an interested party.

Furthermore, as indicated above, an ancillary proceeding may not be required, but Rule 32.2 (c)(1) does not indicate that there is no avenue for third party intervention, as the Government claims.

The Second Circuit does not appear to have rendered a decision regarding this issue. Nor do the other cases cited by the Government clarify the matter.

In <u>Tolliver</u>, the Tenth Circuit leaves open the possibility for an ancillary proceeding. Nowhere does the court indicate that the proceeding is or is not appropriate as the Government claims. It simply indicates that the proceeding is not required.

The Government also cites to <u>United States v. Zorilla Echevarria,</u> 671 F.3d1, 5-6 (1st Cir. 2011) in support of the position that "Third parties have no interest in funds forfeited pursuant to a money judgment." (Motion at p.5)

There may be a distinction between ordering property forfeited and entering a money judgment but third parties are not prevented from filing a claim to money judgments. There is no case law in support of this assertion.

A careful reading of <u>Zorilla-Echevarria</u> will show that the court is not precluding third party involvement in a forfeiture determination regarding a money judgment, but instead was indicating that an ancillary proceeding was not required. The court does state that there is "no provision for third party involvement in the forfeiture determination," but this statement is not a direct quote from Fed. R. Crim. P. 32.2.  Indicating that there is no provision for third party involvement, does not mean that the federal rules were completely excluding third party involvement.  If so, the drafters of the federal rules would have clarified this.

Again, the court appeared to be addressing the issue of the ancillary proceedings requirement in such a matter.

The Government has apparently misconstrued the Zorilla-Echevarria and Candelaria-Silva holdings. In neither case, has the 1st Circuit made it crystal clear that "third parties have no interest in funds forfeited pursuant to a money judgment." The Government cites to this language in p.5 of the motion, but such a precise holding is not to be found in the cases. Different procedures and statutory provisions do apply to different types of criminal and civil forfeitures. The Federal Rules, however, and the Circuit Courts of Appeal, have not clarified the issue pertaining to third party rights to forfeiture money judgments. As the facts are to be construed in favor of the petitioner, in accordance with well-established Motion to Dismiss standards, and the caselaw is not clear, then the court should deny the Government's motion on such grounds.

**(b) Wiederspan's Notices of Lien Should be Approved as She has Standing Under TRIA and as an Interested Third Party and has Fulfilled all the Necessary Requirements for Approval**

1)    Legal Standard for Motion to Dismiss

On a motion to dismiss, the Court must assume that all of the facts alleged by third party petitioner Wiederspan, are true, construe those facts in the light most favorable to, and draw all reasonable inferences in favor of petitioner. See Abdullahi v. Pfizer, Inc., 562 F. 3d 163, 169 (2d Cir. 2009); Vietnam Ass'n for Victims of Agents Orange v. Dow Chem. Co., 517 F.3d 104, 115 (2d Cir. 2008); U.S. Bank Nat. Ass'n v. Ables & Hall Builders, 582 F. Supp. 2d 605, 606 (S.D.N.Y. 2008) (Chin, J.).

The court in Pacheco v. Serendensky, 393 F.3d 348 (2nd Cir. 2004) had to review similar issues in relationship to forfeitures. In Serendensky, the court found:

"Thus, under Rule 32.2, a motion to dismiss a third-party petition in a

forfeiture proceeding prior to discovery or a hearing should be treated like a motion to dismiss a civil complaint under Federal Rule of Civil Procedure 12(b). *See United States v. BCCI Holdings (Luxembourg), S.A.,* 961 F.Supp. 282, 285 (D.D.C.1997) (cited in Fed.R.Crim.P. 32.2 advisory committee's note to subdivision (c)). Only after some discovery has taken place may a party move for summary judgment; at that point the petitioner would be required to produce evidence supporting a *prima facie* case of entitlement, but not before. The district court therefore erred by requiring Pacheco to make a *prima facie* showing to defeat the Government's motion to dismiss." Serendensky at 352.

Accordingly, in reviewing Pacheco's petition, the Serendensky court indicated that it would assume that her allegations are true, *see* Fed.R.Crim.P. 32.2(c)(1)(A); *see also Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), and affirm the dismissal only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations, *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)).

### (c) Wiederspan has Standing and has Clearly met the Burden to Overcome the Motion to Dismiss

In the Notices of Lien, as indicated earlier, Wiederspan has clearly alleged that a certain amount of the funds in question belong to Cuba. Wiederspan raises these claims as a direct result of the Government's allegations in the Statement of Facts and Information.  Namely, In the Statement of Facts, the Government makes numerous references to Cuba's ownership interests in the forfeited funds. In fact, there is a specific reference to monies belonging to Cuba, where the

Government claims: "The purpose of the credit facilities was to provide financing to Cuban entities" and another example mentions how BNPP helped Cuba obtain "US dollar loans for one of Cuba's largest state-owned companies." There are also other examples throughout the Statement of Facts, one of which reads:

> "Beginning at least as early as 2000 and continuing through 2010, BNPP participated in eight Cuban Credit Facilities that involved U.S. dollar clearing and that were not licensed by OFAC. The Cuban Credit Facilities were managed out of BNPP Paris, and each facility processed hundreds (and in some cases thousands) of U.S. dollar transactions in violation of U.S. sanctions. The purpose of the credit facilities was to provide financing for Cuban entities and for businesses seeking to do U.S. dollar business with Cuban entities. One such facility, for example, involved the U.S. dollar loans to a Dutch company to finance the purchase of crude oil products destined to be refined in and sold to Cuba. Another credit facility involved U.S. dollar loans for one of Cuba's largest state-owned commercial companies ("Cuban Corporation 1"), which was designated by OFAC as an SDN".

If BPNPP approved loans for Cuba to buy oil, or for any other similar purpose, then after approval of the loans, the money obviously belonged to Cuba. The Government has not proven that the Subject Funds are separate.

If nothing else, Wiederspan should at least be entitled to discovery in order to help determine where the Subject Funds actually came from. Wiederspan does understand the alleged distinction between the Subject Funds, and BNPP's unlawful business activities with Cuba, in which they clearly and intentionally violated the TWEA. The Government appears to claim that BNPP's unlawful business activity has nothing to do with the Subject Funds. Yet, the Statement of Facts and Information, would lead any reasonable person to believe that the unlawful business activity and Subject Funds are in fact closely related. Nowhere in the documents filed by the Government is there an allegation that the Subject Funds and BNPP's unlawful business activity are not connected. In fact, it is only in response to Wiederspan's Notices of Lien, that the

Government raises these claims. Such an assertion should be supported by evidence, yet filed Government documents indicate otherwise.

**(6) <u>Wiederspan is not Interested in Attaching just any Assets of BNPP.</u>**

The Government submits in the motion that "Wiederspan is effectively arguing that BNPP's financial transactions with Cuban entities from 2010 and earlier entitles Wiederspan, with a judgment against the Government of Cuba, to attach any assets of BNPP. This argument is absurd on its face and its application would result in a power exceeding any given to the Government in enforcing its judgments." (Motion to Dismiss at p. 8).

Wiederspan finds this assertion by the Government to be a bit exaggerated. Throughout the Information and Statement of Facts, the Government makes continual reference to BNPP's unlawful business activities with Cuba. A thorough review of the documents filed in USA v. Paribas, will reveal that the term Subject Funds, is never used. The word "fund" or "funds" is used in relationship to Cuba and Paribas in a number of occasions.

For instance, in par. 54 of the Statement of Facts the Government alleges:

"For example, in January 2006, an ECEP employee at BNPP Paris wrote to two other ECEP employees in relation to one of the Cuban Credit Facilities: "I think we need to point out to [FrenchBank 1] that they should not mention CUBA in their transfer order." One of the ECEP employees responded: " [French Bank 1 ] knows very well that Cuba or any other Cuban theme must not be mentioned in the transfer orders and I reminded them about this over the phone this morning." The first ECEP employee then responded: "Even if [FrenchBank 1 ] ' knows very well,' I prefer for us to write this down each time we ask for a transfer concerning our Cuban transactions." Similarly, in an email exchange in 2007, a BNPP Paris

employee counseled an employee of a Cuban Sanctioned Entity not to mention the name of a Cuban bank on a payment message, or else "these[] funds risk to be stopped by United State[s] further to the embargo." In response, the employee of the Cuban Sanctioned Entity stated that the entity would cancel the already-prepared wire instruction, and instead would execute the transaction "following your instructions"

In par. 61 of the Statement of Facts the Government also alleges:

"Following the receipt of the 2004 Legal Opinion, BNPP Paris compliance, legal and business personnel acknowledged in numerous discussions that the Cuban Credit Facilities did not comply with the U.S. embargo against Cuba, or with BNPP's stated policy that it did not conduct U.S. dollar business with Cuba. A January 2005 e-mail from a BNPP New York compliance officer to a senior BNPP Paris compliance officer stated: "US OFAC laws state that a US entity cannot send or receive funds to/from Cuba. It does not matter that the traders are overseas . . . no USD denominated anything can be transacted with OFAC prohibited entities." In February 2005, BNPP's standardized instructions for the processing of payments related to Cuba stated: "COUNTRY SUBJECT TO A U.S. EMBARGO. The U.S. and foreign banks established on U.S. territory are notably required to proceed with the blocking of assets concerning countries or individuals under U.S. embargo. Any transfer in USD is subject to this regulation. One should thus take care not to proceed with such transactions."

And in paragraph 63 of the Statement of Facts, the Government claims

" In January 2006, a compliance officer at BNPP Paris analyzed BNPP's compliance with U.S. sanctions in light of the ABN AMRO settlement and wrote the following to a group of senior BNPP Paris compliance and business personnel:

Does ECEP run the risk of an allegation for circumventing the embargo? A practice does exist which consists in omitting the Beneficiaries' Ordering party's contact information for USD transactions regarding clients from countries that are under U.S. embargo: Sudan, Cuba, Iran. This avoids putting BNPP NY in a position to uncover these transactions, to block them, and to submit reports to the regulator. This monitoring is practiced especially by the Operational Center in Paris, but it also exists in other centers. However, the fact that SWIFT messages are not referencing the final Beneficiary or the Initiating Party for the movement of funds does not protect the bank totally, because the investigative capacities of U.S. banks . . . are more and more sophisticated. . . . Concerning Cuba - It is true that we are not completely in line with the text of the U.S. regulations. (Emphasis added)."

BNPP's unlawful activities and Cuba's ownership of the funds, is clearly illustrated in these documents offered by the Government.   A somewhat similar situation in a criminal forfeiture proceeding was assessed by the court in US v. Egan, 829 F. Supp. 829 (S.D.N.Y 2011).   There, the court provided the following analysis, which is directly related to Wiederspan's interests in this matter:

"Therefore, in criminal forfeiture proceedings conducted pursuant to 21 U.S.C. § 853(n), the Government "stands in the defendant's shoes," and a petitioner who establishes a legal interest in property superior to the defendant is entitled to recovery of its property. United States v. Nektalov, 440 F.Supp.2d 287, 294–95 (S.D.N.Y.2006), aff'd E.J.D. Diamond Manu. v. United States, 273 Fed.Appx. 65 (2d Cir.2008). In other words, "a defendant's consent to forfeit property does not expand the Court's power over that property, if the property is not the defendant's own." United States v. Schwimmer, 968 F.2d 1570, 1580–81 (2d Cir.1992). The district court is required to amend a preliminary forfeiture order where a claimant demonstrates by a preponderance of the evidence that the claimant had a legal right, title, or interest in the property that was either: (1) vested in the third party rather than the defendant; or (2) was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property. 21 U.S.C. § 853(n)(6). See Willis Management, 652 F.3d at 245–46, 2011 WL 2726055, at *8. [6] [7] Whether a claimant has a "legal interest" is determined by reference to the law of the state giving rise to the property interest asserted. Willis Management, 652 F.3d at 242, 2011 WL 2726055, at *5 (citing Pacheco, 393 F.3d at 353–56). However, as a matter of federal law, only one claiming an interest in the specific property—the res—that is the subject of a preliminary forfeiture order has standing to bring a claim. DSI Assocs. LLC v. United States, 496 F.3d 175, 184 (2d Cir.2007). Therefore, a general creditor of the defendant may not recover funds by filing a petition under 21 U.S.C. § 853(n). Id." Egan at 835.

As discussed above, the Claimants' petitions plausibly assert legal interests in portions of the seized funds, and therefore are entitled to a hearing on the merits. Therefore, the Government's Motion to Dismiss Petitions for Ancillary Hearing is DENIED." Egan at 835.

Wiederspan has similarly met its burden, under Motion to Dismiss standards, of sufficiently alleging that the funds are related to Cuba, and that Cuba had an ownership interest in such funds.   For these reasons, and others, Wiederspan has standing, and the Motion should be denied.

**(7) The Government's Description of the Legal Standard is Misplaced and not Directly Applicable to this Matter.**

The Government argues that Wiederspan's Notices of Lien should be dismissed because Wiederspan lacks standing to intervene in this Criminal Action.

This statement is misplaced and misleading, as Wiederspan is not attempting to intervene in this criminal action.  Wiederspan instead has filed Notices of Lien as an interested third party.

Afterwards, the Government reiterates the legal standard  to contest a Governmental forfeiture action, and indicates that the claimant "must have both standing under the statute or statutes governing their claims and standing under Article III of the Constitution as required for any action brought in federal court." United States v. Cambio Exacto, S.A., 166 F.3d 522, 526 (2d Cir. 1999). Wiederspan agrees and believes she has met both standing under the applicable statute and Article III. Wiederspan has already also demonstrated standing under the TRIA, and applicable federal regulations.

 To demonstrate standing, a petitioner or claimant "must demonstrate (1) a concrete, particularized, and 'actual or imminent' injury, (2) 'a causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood] . . . that the injury will be redressed by a

favorable decision' of the court." United State v. Twenty Miljam-350 IED Jammers, 669 F.3d 78, 91 (2d Cir. 2011) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).

Wiederspan's injury is concrete, particularized, and actual. If not allowed to properly present her interests, she will not be able to satisfy any portion of her judgment. Similarly, if the motion is approved, BNPP would have been allowed to trade with the enemy, which is also her judgment debtor, and Wiederspan would not have been able to recover for her father's assasination.

Her injury, failure to collect and attempt to right a wrong, is casually connected to the conduct complained of.   The conduct complained of involves BNPP's unlawful activities and it's surreptitious concealment of Cuba's funds. Specifically, the bank's assistance to Cuba in the country's business activities, and attempts to hide Cuba's assets from the U.S. Government and Cuba's judgement creditors. The injury will clearly be redressed by a favorable decision of the court.

The Government also mistakenly relies on other civil forfeiture case law that applies to general creditors, not judgement creditors against a country.   In forfeiture actions, it is well established that general creditors of a debtor lack standing to challenge the forfeiture of the debtor's assets. United States v. Khan, No. 97-6083, 1997 U.S. App. LEXIS 31870, at *4 (2d Cir. 1997) ("appellants all are essentially unsecured creditors of the owner's seized property, and as such do not have standing to challenge this seizure"). The Government's reliance on Khan is misguided.  There, the district court dismissed a third party claimant creditor and precluded them from contesting on an *in rem* civil forfeiture. This matter, instead, involves a criminal forfeiture. Furthermore, in Khan, the claimants were general creditors of a bank account, whereas

Wiederspan is a judgement creditor which has filed a lien against specific assets to collect from the party, BNPP, that held onto those assets in constructive trust for the judgment creditor.

The Government also cites to U.S. v. Ribadeneira.105 F.3d 883 (2nd Cir. 1997) to challenge Wiederspan's interest in the forfeited assets. In Ribadeneira, like in Khan, but unlike in this case, the petitioners failed to demonstrate that they were entitled to a constructive trust under New York Law. Id. at *2, 1997 U.S. App. LEXISA 318770 at *7.

The federal court for the Southern District of New York, in USA v. Madoff, No. 09- CR.- 213 (DC) 2012 WL 1142292, (S.D.N.Y April 3, 2012), addressed the issue which differentiates a general creditor from a judgment creditor who has filed liens. In Madoff, the court applied the following analysis:

> "21 U.S.C. § 853(n)(6) (B )
>
> a.   Applicable Law.   Under 21 U.S.C. § 853(n)(6)(B), a third-party petitioner may prevail if he establishes that: (1) he acquired the interest in question as a bona fide purchaser for value as defined by state law; (2) he possesses a legal right, title, or interest in the forfeited property; and (3) he was reasonably without cause to believe that the property was subject to forfeiture at the time the interest was acquired. 21 U.S.C. § 853(n)(6)(B); see Ribadeneira, 105 F.3d at 835.
>
> A petitioner generally has reason to believe that property is subject to forfeiture after an arrest or indictment of its owner has occurred. Timley, 507 F.3d at 1131.
>
> b.   Application.  **Here, for the reasons stated above, EBG's § 853(n)(6)(B) claim also fails because it did not perfect its lien and, as "a general**

**creditor" without a legal interest in the settlement funds, it "may [not]**

**achieve standing by virtue of being a bona fide purchaser for value" under**

**§ 853(n)(6)(B)."** Ribadeneira, 105 F.3d at 836. ("emphasis added").

CONCLUSION      EBG cannot prevail under 21 U.S.C. § 853(n) because

it cannot assert a legal interest in the forfeited property. Accordingly, EBG's

petition is denied and the Government's motion to dismiss is granted. The Clerk

of the Court shall enter judgment accordingly."

The Madoff court was thus clarifying the difference between a general creditor and a judgment creditor who has effectively filed a lien. In applying this distinction to the case at bar, it is clear that the Madoff court  would find that Wiederspan's interest, as a judgment creditor who has effectively filed a lien to attach to the assets, is a bona fide purchaser for value under state (NY) law, who possesses a legal right, title, or interest in the forfeited property.

The Government also cites to an asset forfeiture law book to further support the unsecured creditor claim. In Stefan D. Casella, Asset Forfeiture Law in the United States § 10-5(c) (2012) there is reference to the fact that ("The courts universally hold that unsecured creditors lack standing to contest the forfeiture of another person's property.").

However, further reading of the asset forfeiture book clarifies that Wiederspan, or a judgement creditor, who has filed a lien, is not an unsecured general creditor. In section 10-3, the book indicates: " A person with only an in *personam* cause of action against the wrongdoer has no particularized interest in his property; until he obtains a judgement and reduces that judgement to a lien against specific properly, the garage or the money in his wallet. Accordingly, the unsecured creditor has no right to intervene when the Government files a forfeiture action against those assets." (emphasis added).

Wiederspan has a particularized interest in the funds in this matter. She has <u>obtained a judgement and reduced that judgement to a lien against the specific funds.</u> As a judgement creditor, Wiederspan thus has a right to have her judgement satisfied from the funds in this proceeding.

### (8) Public Policy is in favor of Wiederspan's Interests Being Protected

The Government's reference to important policy reasons not to impose a constructive trust over the Subject Funds are without reason. Cuba obviously had ownership interests in the funds in question. It is in the interests of the United States, for judgment creditor's rights, against enemy states, to be respected.

Given the evidence presented by the Government itself of Cuba's involvement and BNPP's unlawful actions, it appears strange that the Government would propose public policy arguments that appear to protect BNPP. BNPP should be left to sort out its problems with its former clients. That should not be the Government's concern. Protecting US citizen judgment creditor's rights against enemy states and bank's that hide their assets, are much more important policy matters. BNPP has proven itself to be sophisticated yet criminally elusive in its dealings with enemy states. The US Government should not have to worry about it possibly having to pay an additional 1% of it's $8.9 billion dollar forfeiture. The proceeds actually, in accordance with applicable forfeiture caselaw, should be withdrawn from the $8.9 billion dollar forfeiture.

If BNPP is obligated to pay an additional 1%, a bank of such stature and repute, should not have much difficulty in subsequently collecting the appropriate funds, from its former rogue clients.

### (9) Wiederspan is Entitled to the Imposition of a Constructive Trust Over the Funds

In <u>Beatty v. Guggenheim Exploration Co</u>., 225 N.Y. 380, 386, 122 N.E. 378 (1919), Judge Cardozo wrote: "A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." That spirit animates the Court's decision to impose a constructive trust on behalf of the Claimants here.

The Government cites only two cases in support of the proposition that there is no basis to impose a constructive trust. The principles relied on in both cases, have to do with general hornbook law concepts and not specific matters involving Wiederspan's inerests. Wiederspan has explained at length  why a constructive trust should be imposed.

In <u>*United States* v. *Schwimmer*</u>, 968 F.2d 1570, 1583 (2d Cir. 1992), the Second Circuit explained that "[i]t is hornbook law that before a constructive trust may be imposed, a claimant to a wrongdoer's property must trace his own property into a product in the hands of the wrongdoer." <u>*See also United States* v. *Peoples Benefit Life Ins*. *Co.*</u>, 271 F.3d 411, n.4 (2d Cir. 2001) (per curiam) (affirming district court's decision to prohibit intervention in forfeiture action based on a constructive trust theory because the claimant could not trace its assets to the defendant's property "*ex ante*").

Throughout the Information and Statement of Facts, the Government itself indicates that BNPP assisted Cuba with over $1.7 billion in business transactions. BNPP housed and hid such assets from the U.S. Government. If not for BNPP's unlawful acts, Wiederspan could have collected against those funds, since, during the time BNPP committed such acts, the funds were Cuba's. If nothing else, Cuba had an interest in the funds. Wiederspan can thus easily trace her property to property held by BNPP.

In the Amended Notice of Lien, pages 5-11, Wiederspan thoroughly explains why a constructive trust should be imposed under New York law. Federal courts have often recognized the need to fashion a constructive trust on behalf of a petitioner when equity requires it. The law of the state where the funds is held are applicable to the forfeiture proceeding. Under New York ("NY") law a money judgment creditor such as Wiederspan can attach to any real and personal property of the debtor.

Under NY law a constructive trust is an equitable remedy imposed to prevent unjust enrichment. <u>Simonds v. Simonds</u>, 45 NY2d 233, 242 (1978). What is required, generally, is that the complaining party have a right or interest in property wrongfully held by another party "under such circumstances that in equity and good conscience he ought not to retain it." <u>Miller v Schloss,</u> 218 NY 400, 407 (1916); <u>Sharp v Kosmalski</u>, 40 NY2d 119, 123, (1976).

In the case at bar, all of the elements have been met for the creation of a constructive trust. Namely, (1) there existed a confidential, fiduciary, and fraudulent relationship between Paribas and Cuba; (2) a promise existed whereby Paribas would surreptitiously hide Cuba's assets; (3) Cuba transferred the funds to Paribas; (4) both Cuba and Paribas ought not to have retained the funds, and (5) Wiederspan has a demonstrated interest in those assets as evidenced by her judgment lien.

The Second Circuit in <u>Willis Management (Vermont), Ltd v. United States</u>, 652 f.2d 236 (2d Cir. 2011) perhaps best describes Wiederspan's interest in the funds at issue: "Nothing about 21 U.S.C. § 853(c) suggests that the United States' interest trumps that of all other parties. On the contrary, § 853(c) states that even though the United States' interest "vests" "upon the commission of the [criminal] act,"… a third party could show, pursuant to § 853(n)(6)(A), that it has a "legal . . . interest" in the property superior to the defendant's. <u>This is true because if a</u>

constructive trust properly should be imposed on particular property that was in the possession of the defendant, it was never truly the defendant's property and is not subject to forfeiture to the United States in the first instance." (emphasis added).

These documents, produced by the Government, clearly reflect Cuba's ownership interest in the funds. Based on these facts and NY caselaw, a constructive trust should be formed on behalf of Wiederspan.

<u>**CONCLUSION**</u>

For the reasons set forth above, Wiederspan respectfully requests that the court deny the Government's motion and approve her request for payment of the funds owed. In the alternative, Weiderspan requests that the Court deny the motion and grant a conference or hearing in this matter to address Wiederspan's interests.

Dated: New York, New York
      April 10, 2015

Respectfully submitted,


<u>/s William J. Sanchez</u>
**William J. Sanchez Esq.**
William J. Sanchez P.A.
*Partner-Lead Counsel for Plaintiff Marilyn Wiederspan*
**Jennifer Ale, Esq**
12600 SW 120th Street, Suite 102
Miami Florida 33186
PH: 305.232.8889
FAX: 305.232.8819
<u>William@wsanchezlaw.com</u>
